# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GUY GANNAWAY,

      Petitioner,

vs.                            **CASE NO. 8:13-cv-1635-T-30MAP**
                                  **CRIM. CASE NO. 8:10-cr-59-T-30MAP**

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER

**BEFORE THE COURT** is Petitioner Guy Gannaway's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (CV Doc. 1) and the Government's response (CV Doc. 19).[1]  Upon consideration, the court concludes that the motion should be DENIED.

## Procedural Background

An indictment charged Gannaway with conspiring to violate the Clean Air Act, in violation of 40 C.F.R. §§ 61.145(c)(1)), (c)(8), 42 U.S.C. § 7413(c)(1), and 18 U.S.C. § 1001 (Count One), violating the Clean Air Act based on multiple failures to comply with asbestos work practice standards, in violation of 42 U.S.C. § 7413(c)(1) (Counts Two through Nine), and making false statements, in violation of 18 U.S.C. § 1001 (Counts Ten and Eleven).  (CR Doc. 1).  On January 27, 2011, a jury convicted Gannaway of Counts One, Two through

---

[1] Although afforded the opportunity (CV Doc. 4), Gannaway, represented by counsel, did not file a reply.

Seven, and Eleven.[2]  Gannaway was sentenced to a concurrent term of ninety days imprisonment on each conviction to be followed by three years of supervised release.  (CR Doc. 290).  Gannaway appealed his convictions.  On May 23, 2012, the United States Court of Appeals for the Eleventh Circuit affirmed Gannaway's convictions.  (CR Doc. 327).

The Government does not challenge the timeliness of Gannaway's Section 2255 motion.  Gannaway presents one ground of ineffective assistance of trial counsel which includes five claims for relief:

**Ground One:**   Trial counsel rendered ineffective assistance by:

Claim 1:        being "ill prepared for trial,"

Claim 2(a):   missing appointments,

Claim 2(b):   failing to call, investigate, or subpoena witnesses,

Claim 3:        not providing expert witnesses,

Claim 4:        not cooperating with co-defendants' counsel in a joint defense,

Claim 5:        neither cross-examining Government witnesses nor using documents for impeachment

### Facts[3]

In 2004, Stephen Spencer and his partners purchased an apartment complex in Indian Shores, Florida [(later named Barefoot Beach Resort ("BBR"))], with the intent of turning the apartments into resort condominiums and reselling them at a profit.  Spencer's group hired contractor Guy Gannaway and his

---

[2]  The jury acquitted Gannaway of Counts Eight, Nine, and Ten.  (CR Doc. 196).

[3]  This factual summary is found in the opinion affirming Gannaway's conviction by the United States Court of Appeals for the Eleventh Circuit.  (CR Doc. 327).

2

company, Gannaway Builders, to renovate the apartments. The majority of the apartments contained regulated asbestos-containing material (RACM) in the form of popcorn ceiling texture. The EPA's standards required Gannaway to survey for asbestos, notify the EPA of the intent to remove the RACM, remove all the RACM before any renovation work began, and have a trained supervisor on-site to oversee the project. Removal of the RACM involves wetting the asbestos materials and carefully lowering them to the floor before disposing of them. 40 C.F.R. § 61.145.

Between 2004 and 2006,[4] Gannaway and Spencer, along with [Keith McConnell (a Gannaway Builders crew supervisor) and John Loder (a member of the Sun Vista Development Group that purchased BBR for renovation)], conspired to violated the Clean Air Act's RACM provisions by failing to properly remove the RACM during the renovations. Specifically, there was no asbestos survey prior to the renovations,[5] Gannaway, at Spencer's direction, covered the popcorn ceiling with drywall,[6] Gannaway disposed of asbestos waste material in on-site dumpsters, and Gannaway conducted all the removal and renovations without the presence of a trained on-site asbestos supervisor.[7] When confronted with the violations by the EPA and the Pinellas

---

    [4] In June 2005, a rainstorm damaged some of the buildings at BBR resulting in the collapse of asbestos-containing ceilings in some of the units. Gannaway Builders, Inc. ("GBI"), in violation of asbestos work practice standards, improperly directed its workers, rather than a licensed asbestos contractor, to clean up and dispose of the debris. GBI did not report this event to Pinellas County authorities or otherwise comply with proper asbestos-removal regulations. On September 14 and 15, 2005, Keith Piercey (a compliance officer with the Occupational Safety and Health Administration) and Mickey Crane (a Pinellas County Air Quality Division inspector) visited BBR in response to an anonymous tip that workers were being exposed to asbestos. (PSR ¶44). Crane took samples of debris from BBR which ultimately tested positive for asbestos. Crane estimated that approximately 6688 square feet of asbestos-containing material had been improperly disturbed. (Id.).

    [5] Pinellas County Air Quality Division ("AQD") issued a number of warning letters to GBI and SVDG regarding the failure to have had an asbestos survey done before beginning renovations. (PSR ¶32). Once Gannaway discovered that no asbestos survey had been completed, he hired M&A Technologies, an asbestos consulting firm, to conduct a survey. Gannaway ultimately signed a consent order with AQD and paid a $1,000 penalty for not having the necessary asbestos survey before beginning renovation. (Id.).

    [6] The selected methods for handling the asbestos at BBR were encapsulation and entombment, methods which left the existing asbestos in place rather than removing it.

    [7] The Clean Air Act authorizes the Environmental Protection Agency to establish "work practice standards" that must be followed for proper handling, removal and disposal of asbestos-containing material. These standards apply to an owner or operator of a renovation operation where the renovated facility contains
(continued...)

County Air Quality Division , the conspirators made false statements about the project.[8] Gannaway eventually admitted civil liability and paid a fine to cover the violations.[9]

## **Standard of Review for Ineffective Assistance of Counsel**

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice.

*Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance

---

[7](...continued)
in excess of 160 feet of "friable" asbestos material. Additionally, at least one on-site representative, trained in proper asbestos handling, must be present when the asbestos material is stripped, removed, handled, or disturbed. (PSR ¶20). *See also* 42 U.S.C. §§ 7412, 7413, 40 C.F.R. §§ 61.141, 61.145.

[8] In November 2005 GBI and Loder received "notice of violation" letters from AQD citing multiple violations of the National Emissions Standards for Hazardous Air Pollutants. GBI vice president Roger Edwards responded to the violations with a letter containing false claims that GBI had properly handled the asbestos-containing material. (PSR ¶48).

[9] Gannaway agreed that GBI would assume liability for the violations of civil county ordinances and ultimately negotiated a settlement with AQD that resulted in Gannaway paying a $15,000 fine. (PSR ¶¶49, 50; CR Doc. 186, p. 36).

claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id. Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," Gannaway must demonstrate that counsel's error prejudiced the defense. *Id.* at 691-92. To meet this burden, Gannaway must show a reasonable probability that, but for counsels unprofessional errors, he would not have pleaded guilty and would have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

Gannaway cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . .We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

### Discussion

### Claims 1 and 2(a)

Gannaway contends that his trial counsel, Pedro L. Amador, Jr., rendered ineffective assistance because he was "ill prepared for trial" (claim 1) and because Amador missed appointments with him (claim 2a). To support his claims, Gannaway offers the following statements in his affidavit:[10]

---

[10] Gannaway did not file a supporting memorandum of law with his motion to vacate but relies only upon his affidavit and its attachments to support his claims for relief.

1. **Mr. Amador was ill prepared for the trial.** I called and sent Mr. Amador at least two emails stating that I did not believe we were ready for trial.[11] Mr. Amador never reacted or responded to any of those

---

[11] In support of this allegation Gannaway provides excerpts from an email conversation between he and Amador which include, *inter alia*, the following statements:

(1) From: Guy Gannaway
Sent: Monday, August 9, 2010 12:56 PM
To: Pedro Amador, Atty (pamador@amadorlawfirm.com)
Subject: Any updates?

Hello Pedro:

Any news on our case? I am curious what any [sic] progress is for my defense. I still can't think of what evidence they have that implicates me criminally.

. . . .

Are you doing any investigation of [GBI vice president Roger Edwards's] illegal contracting? That would surely diminish his quality as a reliable witness if he has bogus implication about me and/or my office[']s knowledge of any neglectful practices.

I am very curious of our take on my case now that you have read all of their discovery. Do you have their witness list? Do we need to get a witness list together? Do we need to get some experts involved?

(2) From: Guy Gannaway
Sent: Monday, August 16, 2010 3:35 PM
To: Guy Gannaway; Pedro Amador, Atty (pamador@amadorlawfirm.com)
Subject: Second Request for Updates

Pedro,

Did you receive the my [sic] email last Monday (below)? . . . . I am very curious to what is going on. I would like to know exactly what the Federal Government has against me. For the life of me I don't understand what they are trying to allege. I read the indictment and it is vague and general. If I knew what they were alleging specifically then I feel I could be helpful to issues we need to defend.

Do we know who is on their witness list[?] If they are bringing in any experts, etc.[?] Do we need to get an investigator to do some interviewing for prospective witnesses for us? Is it helpful to prove that Roger Edwards

(continued...)

is STILL working as an unlicensed contractor not pulling permits, etc[?] I have many people asking me if they can help but we don't know what to defend.

If we are really going to trial, I want to feel good that we are doing everything we can do now so that we are doing the right things and getting as prepared as we need to.

Please respond.

(3)     From:  Guy Gannaway
        Sent:  Monday, December 13, 2010 5:11 PM
        To:  Pedro Amador
        Subject: Trial next month

        Pedro:

        The fact that we are still learning new things that possible witnesses are saying is "scaring me to death." I am convinced, unless you can show me different, that there is "no way we can adequately defend the charges against me by January 10th." The Federal Government has been interviewing people for four years. They can select the witnesses they want and probably paint any picture of the events that they want to.

        I have many more names I can get you to interview. I am disappointed that of the ones I have sent you, so few have been contacted. There has to be more we can do. I wonder if we should send out a mass mailing to employees just like the government did. There are so many people that I didn't even know that could have good information for us. The government has talked to hundreds and we have talked to a dozen or so.

        Additionally, there is a tremendous amount of technical data to go over. We need expert help to interpret the data and we don't have anyone yet. As discussed on the phone, I am convinced we need more than one expert's input to get the best picture of how to use the data as evidence for our defense, etc. I guarantee you that the opinions will be all over the board.

        Pedro, I want to go on record as saying "I do not think we are prepared to go to trial on January 10, 2010 [sic]." Pedro, we have 19 work days not including holidays to be ready for trial on the 10th.

        I will have the info you requested for our Friday meeting at 10:00. Pedro, can we please have a serious discussion about how we can postpone the trial date[?] It is the last thing I want to do as I have been praying everyday for the end of this nightmare/witch hunt, but I only see grave results with what

(continued...)

emails.

2. **Mr. Amador missed appointments with me at his office.** His office is 50 minutes from my house and business. It was hard to get the time to get there and at least twice I went to his office, sat in his lobby trying to call and text him only to find out he was not even at his office and was not planning to meet there. One time I went to his office to get some papers signed and his secretary was asleep in the back and did not answer the call from the receptionist. I drove back home without the papers signed.[12]

(CV Doc. 2, Ex. C, p. 1) (emphasis in original).

In response, the Government argues that Gannaway fails to demonstrate that "Amador's conduct in preparing for trial or responding to emails concerning trial preparation fell below an objective standard of reasonable professional assistance." (CV Doc. 19, p. 9).

_____

[11](...continued)
we are prepared to defend. Please convince me differently.

. . . .

I don't know what I have to do or who I have to talk to, but I will not go to trial unless I believe we are prepared. I cannot do that to my wife and children. I hope you understand.

(CV Doc. 2, Ex. C1, pp. 1-4) (emphasis in original).

[12] In support of this allegation Gannaway provides excerpts from an email conversation between he and Amador which include, *inter alia*, the following statements:

From: Guy Gannaway
Sent: Thursday, April 8, 2010 12:47 PM
To: pamador@amadorlawfirm.com
Subject: Letters from Fed old employees

Pedro:

I have two calls into you over the last three days in response to your "please call me" reply to my last email. I assume you are busy and will call when you need to.

(CV Doc. 2, Ex. C2, pp.1-2).

In support of its argument, the Government provides Amador's unrebutted affidavit in which

Amador avers, *inter alia*:

> I was adequately prepared for trial. I spent hundreds of hours and many multi-hour meetings with Mr. Gannaway. I spoke with witnesses and subpoenaed those I believed would be helpful to our case. As I recall, the defense in this case was that Mr. Gannaway did not willfully violate the law or conspire with anyone to violate the law. That the issues at the two developments were a result of poor supervision and/or rogue employees and not a company wide scheme to avoid asbestos abatement rules. To that end, I presented witnesses that corroborated that there were rules and that if broken, people would be sent home.
>
> I met with Mr. Gannaway many times for many hours during the course of his case. I also had many telephone conversations with him.
>
> . . . .
>
> I met with Mr. Gannaway many times.[13] Might there have been a meeting or two that had to be cancelled or rescheduled over the course of the two plus years I represented him? I am sure there were. He had my cell phone number and we spoke even on weekends. To suggest I did not keep appointments with him is an exaggeration. Further, for Mr. Gannaway to say it was a burden for him to meet in my office flies in the face of the many meetings we had there. As for responding to emails, it is my normal practice not to respond to emails from clients with emails. I usually call them in response.

(CV Doc. 19, Ex. E, Amador Aff., ¶¶5, 6, 9).

Contrary to Gannaway's contention, the record shows that Amador spent considerable

time preparing Gannaway's case. Amador's time records for his work on Gannaway's case

show that Amador spent more than 80 hours conducting interviews and conferences while

preparing for trial and more than 400 hours obtaining and reviewing records in the case. (CV

---

[13] Amador's time records show fifteen pre-trial meetings with Gannaway. (CV Doc. 19, Ex. E, attachs. to Amador Aff., pp. 5-14).

Doc. 19, Ex. E, attachs. to Amador Aff., pp. 5-18). Gannaway fails to specify in either his motion to vacate or his affidavit how a failure to respond to an email rendered Amador's performance deficient.

Gannaway likewise fails to provide any evidence (i.e., dates or times) of appointments that he set with Amador that Amador failed to attend. Gannaway's vague and unsupported statement that he went to Amador's office "at least twice . . . only to find out [Amador] was not even at his office and was not planning to meet [Gannaway] there" is insufficient to state a claim for relief. Moreover, Gannaway does not refute Amador's sworn statements that he met with Gannaway "many times for many hours" nor does Gannaway contest Amador's time records evincing the dates and amount of time spent meeting or corresponding with Gannaway. Because Gannaway fails to provide a factual basis or evidentiary support for either claim 1 or claim 2(a), he cannot establish entitlement to relief. *See Hill*, 474 at 52 (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

### Claim 2(b)

Gannaway contends that Amador rendered ineffective assistance by not calling, investigating, or subpoenaing witnesses Larry Naymam, Angela Steward, and "more than a dozen employees . . . that had lots of knowledge of our safety programs and the things we were doing to keep our sites safe." (CV Doc. 2, pp. 1-2).

<u>Larry Naymam</u>[14]

Gannaway asserts that Amador should have called Naymam to testify at trial and offers the following statements in his affidavit to support this claim:

> I asked Mr. Amador to contact[15] and subpoena Larry Naymam, the Head Building Official for Indian Shores, the municipality that approved all building permits. Mr. Naymam approved all building plans, made all plumbing, mechanical, electric[al], and structural, including drywall screw inspections, of the drywall after our entombments, etc. Larry inspected the work inside all of our surgically cut holes done by Cross [E]nvironmental under containments after our entombments. Mr. Naymam had been at the site three to five times a week for the entire project and had told me that our job was professional and clean. He said he knew we had asbestos and knew what our plan was for entombment and that he had seen that kind of entombment before. (His testimony is encompassed in his testimony at sentencing).[16]

---

[14] Naymam is a building official for the town of Indian Shores who inspected "the plumbing, the electrical, the A[ir] C[onditioning], and the building" at BBR. (CR Doc. 300, pp. 72-73).

[15] One of the emails Gannaway attaches to his motion shows that he inquired of Amador during the course of the trial about calling Naymam as a witness:

> Larry N[aymam] could be a great help to our case. He knows me and [Keith McConnell] reasonably w[e]ll. As we discussed, Larry went into every condo unit during every stage of construction (10 to 12 inspections in each unit).

> Larry knew all about our entombment process and could probably verify that he never saw any disturbances. He may have even seen [Michelle Crane] there. . . . I don't know if it is too late to get him to testify but he could be great for us.

(CV Doc. 2, Ex. C3a, January 23, 2011, email from Gannaway to Amador).

[16] Amador did not represent Gannaway at sentencing. Gannaway's new counsel, Patrick Doherty, Esq., called Naymam as a witness at the sentencing hearing. (CR Doc. 300). Gannaway points to Naymam's testimony to support his argument that Amador should have called Naymam as a witness at trial. Naymam testified on direct examination at the sentencing hearing that he was present at the BBR site "just about every other day, and when [the project] was really moving faster, three to four times a week." (CR Doc. 300, p. 73). He observed Gannaway engaged in the "entombment" process but did not see any asbestos disturbances that he felt rendered the asbestos "breathable or friable" or he would have "had 'em shut the job down if [he had] seen something [he] considered dangerous." (CR Doc. 300, pp. 73-74). Naymam also testified that he did not observe at BBR "anything out of the ordinary or below the standard that [he] would consider normal in the community." (CR Doc. 300, p. 75).

(continued...)

(CV Doc. 2, Ex. C, p. 1).

Amador responds in his affidavit to these allegations as follows:

> I spoke with several witnesses provided by Mr. Gannaway and I issued subpoenas to those that were willing to testify and would be helpful to the case. In fact, I believe I was the only defense lawyer to subpoena and call witnesses in the case. None of the witnesses he discusses in his affidavit were helpful to him or were going to be helpful to him.

(CV Doc. 19, Ex. E, Amador Aff., ¶6).

Which witnesses to call, and when to call them, is the epitome of a strategic decision. *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (citation omitted); *see also Hardwick v. Crosby*, 320 F.3d 1127, 1161 (11th Cir. 2003) (holding that counsel's failure to call certain witnesses is generally considered a tactical decision, not ineffective assistance of counsel). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (citations omitted). "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). "To show that counsel's conduct was unreasonable, [a] defendant must demonstrate that no competent counsel would have taken

---

[16](...continued)
Naymam testified on cross-examination at the sentencing hearing that he did not see any of the asbestos surveys related to BBR and that he did not know precisely about the contents of the asbestos ceilings at BBR. (CR Doc. 300, pp. 76-77). Naymam further testified that he did not see any asbestos disturbances at BBR and that he never observed popcorn ceiling texture in either a dumpster or on the floor. (CR Doc. 300, pp. 77-78).

the action that his counsel did take." *Miranda v. United States*, 433 Fed. App'x 866, 869 (11th Cir. 2011) (citing *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)). Gannaway bears the burden of showing that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

It is unclear from Amador's affidavit whether Naymam was among the "several witnesses" that he spoke with that Amador determined would not be "helpful" to Gannaway. (CV Doc. 19, Ex. E, Amador Aff., ¶6). Even assuming that Amador failed to contact Naymam and that such failure was deficient performance, Gannaway cannot obtain relief. Gannaway provides no evidence that Naymam was either available and willing to testify *at trial* on Gannaway's behalf or that Naymam would have testified as Gannaway hypothesizes. *See, e.g., Bray v. Quarterman*, 265 Fed. App'x 296, 298 (5th Cir. 2008) ("To prevail on [a claim of ineffective assistance of counsel for failing to call a witness], the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted). Gannaway likewise does not establish that Naymam's testimony at the sentencing hearing, albeit somewhat

favorable to Gannaway (and assuming that Naymam would have testified similarly at trial), would have been sufficient, in light of all the other evidence adduced at trial, to result in a different verdict. Absent a demonstration of prejudice, Gannaway cannot prevail on this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92.

Angela Steward[17]

Gannaway claims that Amador rendered ineffective assistance by not calling Angela Steward as a witness at trial. In his affidavit Gannaway asserts:

> I asked Mr. Amador to call Angela Stewar[d] of M[&]A Technologies, our asbestos surveyor and consultant. Angela told me after the trial that she called Mr. Amador before the trial to see if there was anything she could answer for him to prepare for trial and that he seemed too busy to talk to her and said he would call her back and then never returned her call. (See Stewar[d] affidavit).[18] During trial when Angela was testifying, I wrote many notes to Mr. Amador of questions to ask her and he told me, "No," because he did not know what her answer would be. I told him I knew what the answer would be and that she would not lie and it would be very helpful to us. Some examples

---

[17] In 2004, upon learning that no asbestos survey had been done at BBR, Gannaway hired M&A Technologies ("M&A"), an asbestos consulting firm, to conduct an asbestos survey. Steward, a field technician for M&A, collected debris samples from BBR to test for asbestos. (CR Doc. 249, pp. 49, 62).

[18] Gannaway provides with his motion an affidavit from Angela Steward in which she avers:

I, Angela Steward, hereby attest that prior to the trial of United States v. Guy Gannaway, Mr. Gannaway and I communicated and I expressed to him that I would be willing to speak with his trial counsel in order to assist in his preparation for my examination during trial. Although I believe that Mr. Amador may have attempted to contact me, I perceive that the effort to contact me was insufficient.

At trial, I believe that Mr. Amador requested additional documents from my office after my examination during trial. My office responded to subpoenas for document production to other lawyers representing co-defendants in Mr. Gannaway's case and we would have provided all the documents in our possession if requested to do so and would also have freely communicated with Mr. Amador in his preparations for Mr. Gannaway's trial.

(CV Doc. 2, Ex. B).

are: Angela had talked on the phone and met Mickey Long[19] of Clearwater Air Quality at the site many times and that Mickey Long knew exactly what we were doing there and had no problem with it. Also, her knowledge of the day of the disturbance violation from [the Occupational Safety and Health Administration ("OSHA")] and Clearwater Air Quality (CAQ)[20] could have been very helpful on many levels, including but not limited to: the way they both (OSHA and CAQ) conducted their investigation and the intent of our management to comply and how the disturbances happened. She could have also testified that they never wore protective clothing or breathing protection when they walked our disturbance. Keith Pierc[e]y of OSHA asked us to clean and sweep it up. Angela could have also discredited Roger Edwards for his knowledge and his supervision of the asbestos entombment at the Barefoot project. Roger testified he had [sic] did not know what our asbestos entombment process was and that he had not been to the site but one other time prior to our August disturbance violation. In fact, Roger was at the site over twenty times and meeting Angela, running OSHA meetings, and walking all buildings that we[re] being entombed, etc. (There are daily reports signed by Roger Edwards to prove this that I gave to Mr. Amador that he never used).[21]

(CV Doc. 2, Ex. C, pp. 1-2) (attachment citations omitted).

Amador responds in his affidavit to these allegations as follows:

[T]he witnesses Mr. Gannaway says I did not speak with told me that the project was not being run properly, to include Angela Stewar[d] who was on site and saw the project. I spoke with Ms. Steward and she did not have favorable things to say about the project or how it was handled by Gannaway Builders. Thus, his "own expert witnesses" were not going to be helpful. It was apparent to me that Mr. Gannaway was being told one thing by contractors who he was still doing business [with] while the case was pending,

---

[19] Mickey Long (also known as Mickey Crane), an inspector with the Pinellas County Air Quality Division, first visited BBR in December 2004 and inquired about whether an asbestos survey had been completed. Crane collected debris samples from BBR which revealed asbestos. (CR Doc. 232, pp. 25-40). Crane remained involved in the BBR project and conducted a second site inspection in September 2005 in which she observed multiple violations of asbestos work-practice standards. (CR Doc. 52-80). The second inspection resulted in a notice of violation of a county air ordinance.

[20] In his affidavit Gannaway refers the Pinellas County Air Quality Division ("AQD") as "Clearwater Air Quality" or "CAD."

[21] Gannaway did not submit the handwritten reports in support of his motion to vacate.

namely that he was doing the right thing, yet saying something different to me and the government.

(CV Doc. 19, Ex. E, Amador Aff., ¶7).

In assessing a lawyer's performance, "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314. "The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Van Poyck v. Fla. Dept. of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). Counsel's trial strategy cannot be second guessed, as "judicial scrutiny of counsel's performance must be highly deferential." *Chandler,* 218 F.3d at 1314 (quoting *Strickland,* 466 U.S. at 689). Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). As counsel's trial strategy is presumptively reasonable, the determination is not "that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not do a specific act." Rather, the presumption is "that what the particular defense lawyer did at trial . . . were acts that some reasonable lawyer might do." *Chandler,* 218 F.3d at 1314-15.

Gannaway did not file a reply to the Government's response and offers no evidence to refute Amador's sworn statement that he did, in fact, speak to Steward and determined that

Steward would not have been a favorable defense witness for Gannaway. Although Gannaway provides an affidavit from Steward to support his claim of ineffective assistance, neither the affidavit nor any other evidence offered by Gannaway substantiates his allegation that Steward would have testified as he hypothesizes. *See Bray*, 265 Fed. App'x at 298; *Ashimi*, 932 F.2d at 650. Rather, her affidavit, at most, evinces her willingness to speak to Amador. Steward's affidavit does not establish what her actual testimony would have been if she had testified at trial. Specifically, Steward in her affidavit does not confirm or deny that she would have testified (as Gannaway claims), either (1) that she met Mickey Crane "at the site many times,"[22] (2) that Crane "had no problem" with what Gannaway Builders was doing at the site, (3) how OSHA and CAQ "conducted their investigations, (4) "the intent of our management to comply and how the disturbances happened," or (5) that unspecified workers "never" wore protective clothing or breathing protection. (CV Doc. 2, Ex. C, p. 3).

Gannaway includes with his motion a pre-trial email message from Gannaway to Amador dated November 22, 2010, in which Gannaway, apparently at Amador's request, offers his opinion of Steward's statements to the Government in two separate interviews from 2007. (CV Doc. 2, Ex. C6, pp. 53-56). Gannaway responds to individual paragraphs of Steward's "Feds interview." His comments indicate his opinion that Steward provided unfavorable information to the Government. For example, in the email Gannaway states to Amador that if "Angela has [particular information] wrong, it just adds to her other

---

[22] Steward testified at trial that she "never" saw Crane at BBR. (CR Doc. 249, pp. 96-97).

inconsistencies." (CV Doc. 2, Ex. C6, p. 53). Gannaway also states that other information from the interviews is "absolutely not true," and that "Angela was definitely disgruntled." (CV Doc. 2, Ex. C6, pp. 55-56). The information from Steward's interviews with the Government and Gannaway's negative comments supports Amador's statement in his affidavit that Steward "did not have favorable things to say about the project or how it was handled by Gannaway Builders" and was "not going to be helpful." (CV Doc. 19, Ex. E, Amador Aff., ¶7). Gannaway fails to overcome the presumption that Amador's decision to forego calling Steward as a witness was not so "patently unreasonable that no competent attorney would have chosen it." *Adams*, 709 F.2d at 1445.

Consequently, Gannaway has not demonstrated that Amador's performance fell outside the bounds of reasonable professional judgment. *See Waters*, 46 F.3d at 1512 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision."). *See also Darden v. Wainwright*, 477 U.S. 168 (1986) (denying an ineffective assistance of counsel claim because the petitioner failed to overcome the presumption that, under the circumstances, counsel's action "might be considered sound trial strategy"). Furthermore, Gannaway has not established that Amador's trial strategy was so outside the range of professional competence that he suffered prejudice as a result thereof. *Adams*, 709 F.2d at 1445. Having failed to establish both deficient performance and resulting prejudice, Gannaway is not entitled to relief on this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

<u>Other unnamed employees</u>

Gannaway claims that Amador rendered ineffective assistance by not gathering information from other unnamed employees. In his affidavit Gannaway asserts:

> I gave Mr. Amador more than a dozen employees that he could call and get information from that had lots of knowledge of our safety programs and the things we were doing to keep our sites safe.

(CV Doc. 2, Ex. C, pp. 1-2) (attachment citation omitted). Amador responds to this allegation in his affidavit by generally stating that "[n]one of the witnesses [Gannaway] discusses in his affidavit were helpful to him or were going to be helpful to him." (CV Doc. 19, Ex. E, Amador Aff., ¶6).

Gannaway in his affidavit does not name the other witnesses he believes Amador should have spoken with, nor does he explain the substance of the "knowledge" they allegedly possessed that would have been favorable to the defense.[23] Gannaway does not provide evidence establishing that any of these unnamed witnesses were available or willing to speak to Amador, nor has he submitted any sworn affidavits to support his allegation. *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective assistance of counsel claim based on an alleged failure to investigate a witness because petitioner did not present an affidavit from witness demonstrating that he would have provided testimony helpful to the defense)*; United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (holding that failure

---

[23] Gannaway provides exhibits of email messages to Amador in which he names over forty individuals that he believes could have been potential witnesses. (CV Doc. 2, Exs. C3, C3a, C3b, C4). Gannaway in his motion to vacate does not specify which of these individuals are the subject of his ineffective assistance of counsel claim.

to interview witnesses could not constitute ineffective assistance without a showing that the investigation would have helped defendant). "[M]ere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." *Streeter v. United States*, 335 Fed. App'x 859, 864 (11th Cir. 2009) (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001)).

Gannaway's vague and unsupported contention that Amador should have contacted other witnesses, without more, is insufficient to warrant relief. *Tejada*, 941 F.2d at 1559. Gannaway fails to meet either *Strickland's* deficient performance requirement or prejudice requirement to support this claim of ineffective assistance. *Strickland*, 466 U.S. at 691-92.

### Claim 3

Gannaway contends that Amador rendered ineffective assistance by "not provid[ing] any expert witnesses even though Mr. Gannaway requested them and offered viable options to Mr. Amador." (CV Doc. 1, p. 4). In his affidavit Gannaway asserts:

> I gave Mr. Amador the names of Raul Ilaw and Dr. John Abra[ham][24] who were the two consultants Gannaway Builders hired to come to our site within days of our August disturbance. We wanted to learn how it could have

---

[24] Gannaway's counsel at sentencing (Patrick Doherty) called Dr. Abraham as a witness for the defense at the sentencing hearing. Dr. Abraham holds a Ph.D. in preventative medicine and environmental health and formerly worked for the Centers for Disease Control. (CR Doc. 300, pp. 58-59). Prior to and at the time of sentencing, Dr. Abraham was running "a training and consulting operation." (CR Doc. 300, p. 58). Dr. Abraham testified on direct examination that he was contacted by Gannaway to help him address an OSHA violation at BBR. (CR Doc. 300, pp. 61-62). Dr. Abraham testified that he did not know if any workers at BBR were exposed to asbestos. (CR Doc. 300, p. 62). Dr. Abraham testified on cross-examination that he worked with Raoul Ilaw "on the Gannaway thing with regards to OSHA," that he and Ilaw "were trying to generate business in contacting Gannaway Builders," and that he offered to do training for Gannaway's workers but that the training never happened. (CR Doc. 300, pp. 66-67). Even assuming that Dr. Abraham would have testified at trial similar to his testimony at the sentencing hearing, that testimony would not have been particularly helpful to Gannaway.

happened and what we could do to avoid another disturbance in the future and then specifically what Dr. Abra[ham]'s opinion was of our entombment and disturbance and whether he felt we had exposed our workers to any dangerous amounts of asbestos. Either of these two witnesses could have testified to our intentions and our policies prior [to] and after our disturbance. They were also at our OSHA settlement meeting and could testify that no one representative at OSHA ever had issue with our entombment process nor our willfulness of the disturbance and only that we needed to supervise our workers better.

I offered to do a mock up of our entombment procedure and do air testing to prove our process did not cause a disturbance and Mr. Amador said it was not necessary. He always seemed to take the Federal Government[']s charges very lightly. Mock up prepared by ACT & AQC.

(CV Doc. 2, Ex. C, p. 2) (attachment citation omitted).

Amador responds in his affidavit to these allegations by stating that he spoke with "several witnesses" provided by Gannaway but that he chose, for a strategic reason, not to hire an expert witness:

I did not hire an expert because the witnesses Mr. Gannaway says I did not speak with told me that the project was not being run properly . . . . I did not think an expert would help our defense. Any benefit would be outweighed by cross-examination detrimental to our case. For example, showing the pictures of the popcorn material in an open dumpster to a defense expert would only hurt the defense.

(CV Doc. 19, Ex. E, Amador Aff., ¶7).

Again, it is unclear from Amador's affidavit whether Dr. Abraham or Ilaw were among the "several witnesses" that he spoke with that and determined would not be "helpful" to Gannaway.[25] (CV Doc. 19, Ex. E, Amador Aff., ¶6. Even assuming that Amador failed to contact Dr. Abraham or Ilaw and that such failure was deficient performance, Gannaway

---

[25] Gannaway includes with his motion several pre-trial emails to Amador naming Dr. Abraham and Ilaw as potential witnesses that "would be very helpful." (CV Doc. 2, Exs. C3b, C4, C6).

cannot obtain relief.  Gannaway provides no evidence that Dr. Abraham or Ilaw were either available and willing to testify *at trial* on Gannaway's behalf or that Dr. Abraham or Ilaw would have testified as Gannaway hypothesizes.  *See Bray*, 265 Fed. App'x at 298; *Ashimi*, 932 F.2d at 650.

Gannaway fails to demonstrate that Amador's performance fell outside the bounds of reasonable professional judgment.  *See Dorsey v. Chapman,* 262 F.3d 1181, 1186 (11th Cir. 2001), *cert. denied*, 535 U.S. 1000 (2002) (holding that petitioner did not establish ineffective assistance based on defense counsel's failure to call an expert witness because petitioner failed to show that counsel's decision was so patently unreasonable that no competent attorney would have chosen that strategy).  *See also, Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'").  Gannaway fails to overcome the presumption that Amador's decision to forego calling either Dr. Abraham or Ilaw as an expert witness was anything other than trial strategy.  *Strickland*, 466 U.S. at 689; *Perry*, 908 F.2d at 59.

Gannaway also fails to support his speculative contention that the proposed testimony would have resulted in a different outcome at trial.  Because Gannaway satisfies neither *Strickland's* deficient performance requirement nor prejudice requirement to support a claim of ineffective assistance of counsel, he cannot obtain relief.  *Strickland*, 466 U.S. at 691-92.

Gannaway's complaint that Amador did not have him create for trial a mock-up of the

entombment procedure likewise affords him no relief. Gannaway presented a mock-up[26]

---

[26] The mock-up is detailed in Gannaway's supplement to his sentencing memorandum as follows:

On July 8, 2011, a carefully controlled demonstration was conducted, intended to duplicate the asbestos disturbances at the Barefoot Beach Resort . . . . The purpose was to closely replicate the disturbances of "regulated asbestos-containing material" (RACM) for which Mr. Gannaway may be held accountable, under conditions permitting precise measurement of any asbestos emissions caused.

Arrangements were made to use a commercial building . . . that had been previously scheduled for demolition by another contractor. All of the arrangements were supervised on-scene by Mr. Vern Roberts, who operates Vern Roberts Environmental Training, Inc. . . . Mr. Roberts was provided with pertinent trial transcripts and otherwise familiarized with the exact circumstances of the violations found in this case. Additionally, counsel sent an associate (fully familiar with pertinent trial testimony, the PSR and sentencing issues) to meet with Mr. Roberts at the site to discuss and review the preparations for the demonstration. Special emphasis was given to the necessity for precise replication of the actual RACM disturbances coupled with carefully documented expert air sampling and measurement.

A licensed, qualified asbestos abatement contractor, Mr. Ron Isaac, of Asbestos Certified Technicians, Inc. (ACT, Inc.), supervised his employees in performing the encapsulations and entombments conducted. The encapsulation and entombment methods used at the Barefoot Beach Resort projects were duplicated and the RACM disturbances were measured by a certified Industrial Hygienist, Mr. John Booth, of ATC Associates, Inc. of Tampa, Florida. During the process, numerous air samples were taken and submitted for laboratory examination, the results are documented in an attached report. (A DVD recording of the procedure was made during this time and is available for viewing upon the Court's request.)

First, to closely duplicate the Barefoot Beach Resorts conditions and segregate the air for sampling, ACT personnel constructed a containment of approximately one thousand two hundred (1,200) square-feet in a one-story building with popcorn ceilings measuring in excess of five percent (5%) chrysotile asbestos. The room was sealed using plastic, tape and mastic. Within the containment, six (6) air monitoring pumps were set up - three (3) inside and three (3) just outside the door. "Negative air" pressure was established to prevent air, fiber or dust from escaping the containment. Next, using an airless paint sprayer, primer paint was sprayed over the existing popcorn asbestos ceiling to "encapsulate" the popcorn ceiling. Then, one-quarter inch drywall was installed using drywall screws in a simulation of drywall-over-drywall "entombment." Following this, a simulation of drywall-over-furring strips entombment was conducted. One-inch by two-inch furring strips were screwed directly to the popcorn ceiling using one-quarter inch by two-inch laminating screws. Sheets of drywall were then attached to the furring strips using the same drywall laminating screws.

(continued...)

at the sentencing hearing. The Government on cross-examination of Gannaway highlighted the differences between the mock-up and the entombment procedure that was actually undertaken at BBR, including: (1) unlike at BBR, the entombment in the mock-up was undertaken by licensed asbestos abatement contractors, and (2) unlike at BBR, asbestos debris was completely enclosed in a containment area in which workers wore proper protective equipment. (CR Doc. 263, pp. 2-4; CR Doc. 300, pp. 92-97).[27] Gannaway fails to establish that Amador's decision to not use at trial a mock-up which highlighted GBI's violation of asbestos work-standard practices at BBR was unreasonable.

### Claim 4

Gannaway contends that Amador rendered ineffective assistance by not cooperating with his co-defendant's attorneys despite Gannaway's desire "to participate in a joint defense." (CV Doc. 1, p. 4). In his affidavit Gannaway asserts:

> It was clear to me because I had paid very close attention to what my all Owner's [sic] knowledge was. I also paid close attention to [what] the Architect[']s direction and knowledge was. From that I established [p]olicies

---

[26](...continued)
For testing purposes, three (3) air monitoring pumps were located inside the enclosure; three (3) pumps just outside the containment and personal monitors were worn by the workers actually doing the encapsulation/entombments. All samples were forwarded by ATC Associates, Inc. (who collected the samples), to a certified laboratory where the results of the Phase Contrast Microscopy (PCM), Asbestos Air Sampling and the Transmission Electron Microscopy (TEM) final clearance samplings were tested for the presence of asbestos fibers.

All of the six (6) "personnel" samples and the nine (9) air samples from within the enclosure tested below the safe limits set by . . . OSHA.

(CR Doc. 263, pp. 1-3) (attachment citation omitted).

[27] This court noted during the sentencing hearing the significant differences between the work actually done at BBR and the work demonstrated in the mock-up. (CR Doc. 300, p. 128).

I had our management put into place for our [w]orkers, etc., that I was absolutely sure there was not intent to conspire or deceive anyone. There would have been dozens of conspirators, including Cross Environmental, MA Technologies, CAQ and Redington Shore Building Department. It made no sense to me no[t] to pool our recourses [sic] in an effort to put on a more cohesive defense. I knew that because I was the General Contractor that we could provide the most information and that sharing it with my fellow defendants could only help us reinforce all of our intentions and prove the knowledge of all City, State and Federal Agencies related to our work and asbestos processes.

(CV Doc. 2, Ex. C, pp. 2-3).

Amador responds in his affidavit to these allegations by stating:

I met with one of the co-defendant's lawyer[s], Mark Ciaravella,[28] on a number of occasions. Mr. Ciaravella's client, an employee of Mr. Gannaway, had more in common with our defense. I assumed the defense from the others was that the contractor was responsible. Thus meeting with them to tip my hand was not in Mr. Gannaway's best interest. I did meet with the lawyer now representing Mr. Gannaway at his office in preparation for trial. That lawyer and his partner have the reputation of blaming other co-defendants in multi-defendant cases and there was no real reason to meet with him earlier. At that point, I was assured that their defense was not to throw my client under the proverbial bus.

(CV Doc. 19, Ex. E, Amador Aff., ¶8).

Gannaway fails to offer any support for his allegations other than his own self-serving statement that he wished "to participate in a joint defense."[29] Gannaway does not explain how Amador "did not cooperate with fellow defendants' attorneys" or what "resources" he

---

[28] Ciaravella represented co-defendant Keith McConnell at trial.

[29] Gannaway offers no evidence establishing that any of the co-defendants were willing to participate in a joint defense. The Government notes in its response that attorney George Tragos (who represented co-defendant Spencer at trial and whose firm represents Gannaway in this Section 2255 action) advised at the November 8, 2013, hearing in this case that there was no joint defense agreement among the defendants. (CV Doc. 19, p. 18, n.11). The Court notes that Tragos' client, Spencer, was likewise convicted at trial.

should have been shared with the co-defendants. Because Gannaway fails to provide a factual basis or evidentiary support for his allegations, he cannot establish entitlement to relief. *See Hill*, 474 at 52; *Tejada*, 941 F.2d at 1559.

**<u>Claim 5</u>**

Gannaway contends that Amador rendered ineffective assistance by not effectively cross-examining prosecution witnesses Roger Edwards, Matt McCann, Mickey Crane, Keith Piercey, Ron Isaacs, and Deborah Sturtevant "based on [Amador's] failure to contact [the witnesses] in advance or utilize the documents Mr. Gannaway or fellow defendants['] attorneys provided for impeachment purposes." (CV Doc. 1, p. 4). Gannaway asserts in his affidavit that "Mr. Amador did not ask the questions of the Federal Government's witnesses that I ask[ed] him to . . . . Either he ch[o]se not to because he did no[t] deem it important or he did not know how they would answer and was afraid to ask them." (CV Doc. 2, Ex. C, p. 3) (attachment citation omitted).

Amador generally responds in his affidavit to these allegations by stating:

> I believe I was effective in cross-examining witnesses. I am unsure how to respond. It seems to be subjective. I impeached Ms. [Crane] through cross-examination of Angela Stewar[d]. I recall cross-examining an OSHA agent who admitted his report stated there were no violations at the first project. I also admitted that report in evidence during the cross-examination, I believe.

(CV Doc. 19, Ex. E, Amador Aff., ¶10).

Counsel's decision to cross-examine and the manner of the cross-examination are strategic decisions entitled to deference. *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir.

2001).  The only question is whether counsel's strategic decision was "reasonable."  *See*

*Minton v. Sec'y, Dep't of Corr.*, 271 Fed. App'x 916, 918 (11th Cir. 2008) ("The Supreme

Court has 'declined to articulate specific guidelines for appropriate attorney conduct and

instead has emphasized that the proper measure of attorney performance remains simply

reasonableness under prevailing professional norms.'") (quoting *Wiggins v. Smith*, 539 U.S.

510, 521 (2003)).

a. Roger Edwards[30]

Gannaway in his affidavit alleges that Amador should have cross-examined Edwards

as follows:

> Mr. Amador could have impeached Roger Edwards.  Roger stated he knew
> nothing of our process[31] and that he had not been at the Barefoot Beach site
> nor was he supervising anyone there.  I presented Roger's handwritten and
> signed Daily Reports that he walked all buildings over twenty times f[ro]m
> July 2006 until the August violation and disturbance,[32] including running
> onsite OSHA meetings relating to [a]sbestos and was directly in charge of, and
> in constant contact with, Keith McConnell and all other supervisors on that
> project.

---

[30]  Edwards was vice president of GBI.  (CR Doc. 253, p. 20).

[31] Edwards testified on cross-examination by Amador that he *may* have known about the entombment:

Q:      Had you been aware that the process that was going to be used was to encase or
        entomb the asbestos in the early half, the first half of 2005?

A:      It is possible.

(CR Doc. 253, pp. 97-98).

[32]  As the Government notes in its response, although Gannaway refers to July 2006 in his affidavit,
in context, it appears he is actually referring to 2005 and the asbestos inspection at BBR in September 2005.
(CV Doc. 19, p. 22, n.14).

(CV Doc. 2, Ex. C, p. 3).

Edwards testified on direct examination at trial that, when Gannaway Builders began the BBR project, he did not have any involvement at BBR. (CR Doc. 253, p. 2). However, he also testified that he visited BBR "maybe five or six times" during the first six months of 2005 but became more involved in the project that summer, commencing "active involvement" in mid-September 2005. (Id. at pp. 25-26, 41). Edwards testified that he was present at BBR both in June 2005 when the water damage occurred and in September 2005 when OSHA and the local EPA arrived at BBR. (Id. at p. 43). Edwards further testified that, by the fall of 2005, he was a lead supervisor at Gannaway Builders. (Id. at p. 54). In addition to the information elicited on his cross-examination of Edwards, Amador also elicited from other witnesses the extent of Edwards's involvement at BBR.[33]

---

[33] For example, Amador elicited from prosecution witness Mark Stalker (former GBI president) that Edwards was participant in the BBR project and oversaw workers at the site:

Q:    Was Mr. Edwards involved in the day-to-day operations [at BBR in September 2005]?

A:    He wasn't there daily but he was there as a resource for the people on the job to call on if they needed him.

Q:    And when did that role begin for Mr. Edwards?

A:    I don't remember the exact date but in that time period of 2005 when our manpower was getting large, Roger Edwards was to help oversee all the foremen and all the superintendents to help them with their manpower needs and to help coordinate manpower across the company.

. . . .

Q:    And it was just happenstance that Mr. Edwards was [at BBR when OSHA and Mickey Crane came to the site] or was that still part of his responsibilities?

(continued...)

29

Although Amador did not specifically question Edwards on cross-examination about his daily reports as Gannaway suggests Amador should have done, Gannaway fails to overcome the presumption that Amador's performance was reasonable and that he "made all significant decisions in the exercise of reasonable professional judgment." *Chandler*, 218 F.3d at 1314. Gannaway fails to demonstrate that such questioning would have established reasonable doubt about his guilt. Gannaway fails to meet either *Strickland's* deficient performance requirement or prejudice requirement to support this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92.

b. Matt McCann[34]

Gannaway in his affidavit alleges that Amador should have cross-examined McCann as follows:

> Mr. Amador could have clarified that when we m[e]t Clearwater Air Quality and after CAQ had done a thorough investigation of our August 2006[35] disturbance . . . our fines, based on quantities of disturbed asbestos, had nothing to do with our entombment process and that our discussions were limited to only what we would [do] to make sure that, during this kind of

---

[33](...continued)

A: That was his role. If - - he was also responsible for safety across the company. And so, if there's an issue with OSHA, the supervisors were supposed to call Roger.

(CR Doc. 239, pp. 129-30, 132-33). Amador called as defense witnesses Curtis McCoy and Charles Keesling, both supervisors at GBI, who each testified that Edwards was present at BBR and at supervisor meetings on a regular basis. (CR Doc. 336, pp. 6, 15-17).

[34] McCann, an environmental program manager with Pinellas County Air Quality Division, testified about the consent order and settlement between GBI and the Pinellas County Board of County Commissioners. (CR Doc. 186, pp. 32-46).

[35] Again, in context, Gannaway appears to actually refer to the 2005 disturbance at BBR.

entombment, . . . we supervised better in order to avoid employees making that kind of disturbance again.

(CV Doc. 2, Ex. C, p. 3). Gannaway fails to articulate how Amador's failure to further "clarifi[y]" the basis of the fines imposed upon GBI adversely impacted his case. Gannaway has neither rebutted the strong presumption that Amador's strategic decision about how and to what extent to cross-examine McCann was reasonable, nor shown how further cross-examination would have affected the outcome of the trial. Consequently, Gannaway fails to satisfy *Strickland's* requirements and this claim warrants no relief. *Strickland*, 466 U.S. at 691-92.

c. <u>Mickey Crane</u>

Gannaway in his affidavit alleges that Amador should have cross-examined Crane as follows:

Mr. Amador could have impeached her and proved her knowledge of exactly what we were doing at that site. Ms. Crane was at our settlement conference with us and Clearwater Air Quality.

**Note:** Mr. Amador could have made sure the jury knew that when we had a settlement meeting following a full investigation by the Clearwater Air Quality division of our disturbance that day in August and a review of our entire job, I was there, Mark Stalker our President was there, Roger Edwards our Vice President of Field Operations was there. Also present were, Matt McCann Director of Clearwater Air Quality, Mickey Long, Field Investigator and two other Air Quality [e]mployees. They confirmed the amount of disturbance and they determined that it was not will full [sic]. The amount of our disturbance was just what had been found to be disturbed the day of the violation in August. <u>Not one time did anyone from Air Quality tell us our entombment process was wrong</u>.

(CV Doc. 2, Ex. C, pp. 2-3) (emphasis in original).

The record shows that Amador on cross-examination of Crane elicited that she had "about ten contacts with Mr. Gannaway at the beginning of the Barefoot Beach project" and that she and Gannaway discussed the entombment procedure used at BBR. (CR Doc. 232, 154-55). Amador also highlighted on cross-examination that the amount of the disturbance upon which the administrative fine was based was considerably less than the amount of the disturbance estimated by Crane.[36] (CR Doc. 232, pp. 162-63). Gannaway fails to explain how or with what evidence Amador could have otherwise impeached Crane. Gannaway establishes neither deficient performance nor resulting prejudice to substantiate this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92.

d.     Keith Piercey[37]

Gannaway in his affidavit alleges that Amador should have cross-examined Piercey as follows:

> Mr. Amador could have clarified with him that originally Keith was investigating our disturbance as if it was willful. He would have said he did a full investigation including taking air samples and interviewing every single employee at the site that day. He would have said that he found out the three

---

[36] Crane testified on direct examination that her measurement of the disturbance at BBR for which GBI received a notice of violation from Pinellas County was approximately 6000 square feet. (CR Doc. 232, p. 91). GBI responded to the notice by stating that it disagreed with Crane's calculation and estimated that only approximately 700 square feet had been disturbed. (CR Doc. 186, pp. 31-32). McCann (the environmental program manager with AQD) testified that the exact amount of the disturbance was not agreed upon "but due to the amount of time that would be necessary to continue this disagreement between their calculations and our calculations, we didn't feel it was worth our resources to pursue that any further." (CR Doc. 186, p. 37). Under either calculation, the amount of the disturbance exceeded the 160 square foot threshold designated in the EPA's work practice standards. *See* 40 C.F.R. § 61.145. The parties ultimately agreed upon a $15,000 fine.

[37] Piercey is the OSHA compliance and safety officer who inspected BBR in September 2005. (CR Doc. 243, pp. 96-97).

people that had done the disturbance and confirmed that they knew they were not supposed to and had done it on their own accord.  Keith will confirm that he feels we were not willful in our disturbance.

**Note:**  Same as with Clearwater Air Quality meeting above:  when me, Mark Stalker, Roger Edwards and our new [c]onsultants Raul Ilaw and Dr. John Abramson and K[e]ith Pierc[e]y and his Supervisor from OSHA all met at the OSHA office to mitigate and settle our OSHA violations.  They also confirmed after a full investigation that we were not willful.  Also again, not one time did anyone from OSHA tell us that our entombment process was wrong.

(CV Doc. 2, Ex. C, p. 4).

Amador elicited from Piercey on cross-examination the information Gannaway claims

Amador should have highlighted for the jury; specifically that OSHA did not pursue willful

violations against GBI.[38]  As to the other information Gannaway claims Piercey "would have

---

[38]  Specifically, Amador inquired:

Q:       Now, you said that you interviewed a number of individuals and OSHA made a decision about whether to pursue willful violations; correct?

A:       I believe that was discussed with the area director.

. . . .

[Admission of Stephen Spencer's Exhibit Number 52].

Q:       (Changes overhead exhibit).  Now, this document is an email explaining why there were no willful violations pursued against Gannaway Builders; correct?

A:       Correct.

Q:       And in this document it also indicates that some of the people that you spoke with originally saying that they were allowed to break into the - - well, let's just read the document - - okay.  You interviewed the people; correct?

A:       Correct.

Q:       And then you re-interviewed them because you got some conflicting information?

(continued...)

said," Gannaway offers no affidavit or other evidence substantiating his allegation that Piercey would have testified as he hypothesizes. *See Bray*, 265 Fed. App'x at 298; *Ashimi*, 932 F.2d at 650. Gannaway establishes neither deficient performance nor resulting prejudice to substantiate this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92.

e.    <u>Ron Isaacs</u>[39]

Gannaway in his affidavit alleges that Amador should have cross-examined Isaacs as follows:

> Ron told me that he had seen this kind of entombment many times in Pinellas County and other places.

---

[38](...continued)

A:    Correct.

Q:    And those people that you re-interviewed, in fact, changed their story?

A:    At least one of them recanted.

Q:    So, they informed you that Gannaway Builders, in fact, had a policy concerning the disturbance of asbestos-containing material; correct?

A:    The English-speaking employees I could talk to told me that Gannaway had told them not to disturb the material.

. . . .

Q:    Now, could you read the last paragraph there, please?

A:    "In summary, we proposed the appropriate violation but determined that they were not willful as we could not show management knowledge that the employees were cutting in the [asbestos-containing material] rather than contacting their supervisor about the need for such work who would call the remediation team back out to do it properly."

(CR Doc. 243, pp. 119-22).

[39] Isaacs is a project manager from Asbestos Certified Technicians ("ACT") which was contracted to do asbestos encapsulation (similar to that done at BBR) at Shore Club, another condominium renovation project on which GBI worked. (CR Doc. 253, pp. 180-82).

> **Note:** Mr. Amador could have told the jury that this kind of entombment was done to the entire Snell Isl[e] Project that was owned [b]y Sun Vista and lost to foreclosure. But the new Contractors did the same thing with the approval of Clearwater Air Quality and the Federal Investigators.

(CV Doc. 2, Ex. C, p. 4).

Gannaway does not present evidence establishing that if Isaacs had testified to seeing the entombment process used in other locations (particularly Snell Isle), such testimony would have had a material impact on the outcome of his trial. The charges Gannaway faced focused upon the improper manner in which he and his employees executed the entombment at BBR, not the legality of the process itself. Gannaway fails to show prejudice resulting from Amador's failure to cross-examine Isaacs about his knowledge of the use of entombment on other projects. Further, Gannaway's assertion that Amador "could have told the jury that this kind of entombment was done to the entire Snell Island project" affords him no relief. Gannaway fails to cite any admissible evidence that Amador could have used to introduce information about Snell Isle, a project that was not the subject of any charge in the indictment.[40] Because Gannaway fails to establish both deficient performance and prejudice based on Amador's failure to cross-examine Isaacs as he now suggests, no relief is warranted on this claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 691-92.

---

[40] Gannaway does not acknowledge that Amador moved in a pre-trial motion *in limine* to exclude evidence about Snell Isle. (CR Doc. 149).

f.    <u>Deborah Sturtevant</u>[41]

Gannaway in his affidavit alleges that Amador should have cross-examined Sturtevant

as follows:

> Deb[orah] could have been impeached for her supervision of our project.  She
> had multiple open permits on our project the entire nine months we did our
> entombment.   Cross had open permits on many of the buildings at a time
> Gannaway Builders was being accused of disturbing.  If our process was not
> being done correctly, then because many of the buildings that we were
> working on were at the time under permit by Cross Environmental, then they
> could have been responsible for not supervising correctly or at least should
> have told us to stop.
>
> **Note:**  Mr. Amador never told the jury there is not one memo, one documented
> phone call, not one letter from Cross Environmental (or M[&]A Technologies
> for that matter) that warns us that Gannaway Builders, Inc., was doing
> anything wrong, being sloppy or negligent with anything we were doing with
> our asbestos entombment.

(CV Doc. 2, Ex. C, p. 4).

Although Amador conducted only a brief cross-examination of Sturtevant (CR Doc.

240, pp. 88-89), his questioning followed an extensive cross-examination by counsel for

co-defendants Loder and Spencer (Spencer's counsel at trial is Gannaway's counsel in this

petition).  In those cross-examinations, Sturdevant testified, *inter alia*, about CES's presence

at the work site and her repeated advice that, while entombment was an acceptable method

for dealing with the asbestos, the work should nonetheless have been undertaken by a

licensed asbestos contractor rather than untrained GBI employees. (CR Doc. 240, pp. 50-88).

---

[41]  Sturtevant is an employee of Cross Environmental Services ("CES"), a company specializing in
asbestos abatement.  CES was hired to make, in accordance with proper asbestos abatement procedures,
"surgical cuts" through the entombed ceilings at BBR for installation of electrical conduit.  (CR Doc. 240,
pp. 20-22).  Sturtevant managed CES's work at BBR.  (Id. at p. 22).

Gannaway fails to demonstrate that Amador's decision to only briefly question Sturtevant was an unreasonable strategic decision. *Fugate*, 261 F.3d at 1219; *Minton*, 271 Fed. App'x at 918. Moreover, even if Amador had elicited from Sturtevant the information Gannaway claims he should have, Gannaway fails to establish that impeaching Sturtevant would have resulted in a different outcome despite all of the other evidence adduced at trial. *Strickland*, 466 U.S. at 691-92. Gannaway's failure to satisfy *Strickland's* requirements precludes relief on this claim of ineffective assistance of counsel.

### Evidentiary hearing

This case warrants no evidentiary hearing because "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief." *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003).

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Gannaway's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (CV Doc. 1) is DENIED.

2. The Clerk is directed to enter judgment against Gannaway and to close this case.

### CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Gannaway is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must

first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To make such a showing, Gannaway "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Gannaway has not made the requisite showing in these circumstances. Finally, because Gannaway is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on January 30, 2014.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

F:\Docs\2013\13-cv-1635 deny 2255.wpd